# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **ALBERT FRANKLIN, Jr.** | ) | |
| | ) | |
| v. | ) | No. 3:19-cv-00589 |
| | ) | (Crim. Case No. 3:10-cr-00055) |
| **UNITED STATES OF AMERICA** | ) | |

## MEMORANDUM OPINION

Pending before the Court is Albert Franklin Jr.'s Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 (Doc. No. 1). That Motion has been supplemented by Franklin acting *pro se* (Doc. Nos. 4, 17, 29), as well as by court-appointed counsel (Doc. Nos. 25, 38). All issues have been extensively briefed by the parties. (Doc. Nos. 22, 25, 26, 32, 33, 38, 39).

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

On August 29, 2013, after a 3-day jury trial, Franklin was convicted on three counts: (i) conspiring to possess with the intent to distribute oxycodone in violation of 21 U.S.C. § 846 (Count One); (ii) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Two); and (iii) carrying and brandishing a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count Three). He was subsequently sentenced as an armed career criminal by Judge William J. Haynes to 360 months imprisonment consisting of 276 months on Counts One and Two, and a consecutive term of 84 months on Count Three.

Franklin appealed both his convictions and sentence. On appeal, the Sixth Circuit summarized the facts underlying Franklin's crimes as follows:

> This case stems from an undercover reverse drug operation undertaken by the Metropolitan Nashville Police Department (MNPD). This operation involved the participation of a confidential informant, Michael Kirkup, who solicited buyers for Oxycontin pills. As part of the operation, Kirkup contacted an acquaintance named Anthony "Duck" Griffin to inform him that Kirkup had a large quantity of Oxycontin

pills for sale. Kirkup claimed that the pills had been stolen from a pharmacy. Griffin told Kirkup that his cousin (apparently referring to Franklin) might be interested in purchasing the pills. Following this conversation, Griffin contacted Franklin to coordinate the sale. Over the course of a number of conference calls between Kirkup, Griffin, and Franklin, an agreement was reached pursuant to which Franklin would purchase 3,000 Oxycontin pills for a sum of $22,000 in cash. Per Franklin's request, the drug deal was scheduled to take place at Mustang Sally's Bar, a bar owned by Franklin in Nashville, Tennessee.

The arranged reverse drug operation took place on the evening of January 26, 2010. The MNPD gave Kirkup 3,000 placebo pills to stand in for 80mg Oxycontin pills, and outfitted Kirkup with a recording device and transmitter. Kirkup picked up Griffin and drove to Mustang Sally's Bar. Griffin entered the bar ahead of Kirkup. When Kirkup entered the bar, Franklin locked the door and asked Kirkup to show him the pills. Franklin examined the pills, and quickly thereafter took out a revolver and pointed it at Kirkup's head. Franklin then forced Kirkup to leave the bar and locked the door behind him as Kirkup ran out of the bar yelling "gun, gun." The officers attempted to enter the bar, but were thwarted by the bar's steel doors. The officers then called a S.W.A.T. team and obtained a search warrant for the bar. Franklin, Griffin, and three women exited the bar willingly before the search was executed.

Upon executing the search, officers found a loaded Smith & Wesson .357 magnum caliber revolver hidden behind a wall in the bar. No useful fingerprints were removed from that gun. One woman named Brenda Poteete, who had been inside the bar and had witnessed the events, testified that she saw Franklin pointing a gun at Kirkup. She also testified that once Kirkup exited the bar, Franklin left the main bar area with the gun for a short period of time and returned without it. Poteete initially denied seeing the gun, but testified at trial that she lied to the police at first because Franklin had told her to say that he was wielding a stapler, rather than a gun, and because she was afraid. At trial, Kirkup testified to the events leading up to the arranged drug transaction and the events at the bar. Additionally, the jury was allowed to hear the audio recording from the recording device that Kirkup wore into the bar.

Franklin testified in his own defense. He admitted that he intended to purchase the Oxycontin from Kirkup and that Griffin had arranged the transaction, but denied having a gun at any point in the transaction. Instead, Franklin claimed that, upon observing activity outside of the bar, he became suspicious and grabbed a stapler while pushing Kirkup out the door. Franklin insisted that, for his safety, he waited for the news media to arrive before voluntarily exiting the bar.

United States v. Franklin, 622 F. App'x 501, 504 (6th Cir. 2015) (Franklin I).

The Sixth Circuit rejected Franklin's claim that the Speedy Trial Act had been violated because he had not shown actual prejudice. It also rejected Franklin's contention that the trial court erred in denying his motion to suppress because the search warrant application contained sufficient content to support a finding of probable cause. Id. at 505-510. The court also found sufficient evidence to support Franklin's convictions on each count. Sentencing, however, was different matter.

While the case was pending on appeal, Johnson v. United States, 135 S.Ct. 2551 (2015) was decided. There, the Supreme Court held that the residual clause of 18 U.S.C. § 924(e) was void for vagueness. Id. at 2564. As a consequence, Franklin's prior convictions for attempted burglary and felony evading arrest were no longer considered "violent felonies" under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). The case was then returned to this Court for resentencing.

On remand, a revised Presentence Report was prepared by the probation office and it again recommended that Franklin be sentenced as a career criminal by including new predicate offenses to replace the ones that no longer qualified. Specifically, it listed Franklin's conviction of the following as felonies or serious drug offenses under the ACCA: (1) April 2, 1985 convictions for Aggravated Assault, House Burglary, and Kidnaping in Case Nos. 1072, 1073, and 1074 in the Madison County Criminal Court, Canton, Mississippi; (2) September 24, 1985 convictions for robbery with a deadly weapon in Case Nos. 84-06255 and 06256 in the Shelby County Criminal Court, Memphis, Tennessee; and (3) a January 18, 2008 conviction for Possession of a Controlled Substance with Intent, in the Davidson County Criminal Court, Case No. 2007-B-1386. (Case No. 10-cr-00055, Doc. No. 334 at 10). Thereafter, the Court deemed Franklin qualified for sentencing as an armed career criminal and, on October 26, 2017, Franklin was resentenced to 267 months

consisting of 183 months on Counts One and Two and a consecutive sentence of 84 months on Count Three, plus a special assessment of $100 on each count. (Id., Doc. No. 319 at 2, 8). Again, Franklin appealed his sentence, but this time it was affirmed. United States v. Franklin, 758 F. App'x 469 (6th Cir. 2018) (Franklin II). Franklin's Section 2255 motion to vacate in its various permutations followed.

## II. APPLICATION OF LAW

Section 2255 provides that a federal prisoner who claims that his sentence was imposed in violation of the Constitution (among other things), "may move the court which imposed the sentence to vacate, set aside or correct the sentence." To obtain relief under § 2255, the petitioner must demonstrate constitutional error that had a "substantial and injurious effect or influence on the guilty plea or the jury's verdict." Humphress v. United States, 398 F.3d 855, 858 (6th Cir. 2005) (citing Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003)).

A court should hold an evidentiary hearing in a Section 2255 proceeding where a factual dispute arises, unless the petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or [are] conclusions rather than statements of fact.'" Ray v. United States, 721 F.3d 758, 761 (6th Cir. 2013)(citation omitted). Additionally, no hearing is required where "the record conclusively shows that the petitioner is entitled to no relief." Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999) (citation omitted).

Through his various filings, Franklin brings an assortment of claims, some of which have been supplemented by counsel. This includes a so-called Rehaif claim, various claims of ineffective assistance of counsel, and a claim that his re-designation as an armed career criminal was error.

Having reviewed the pleadings, briefs and records filed in both the underlying criminal case

4

and in this case, the Court finds an evidentiary hearing unnecessary on any of Franklin's claims. This is because the record itself conclusively establishes that he is entitled to no relief under Section 2255.

A. **The <u>Rehaif</u> Claim**

In <u>Rehaif v. United States</u>, 139 S.Ct. 2191 (2019), the Supreme Court held that, in order to convict a defendant for being a felon in possession, the government is required to prove not only that defendant was in possession of a firearm, but also that he knew he was a felon when he possessed the firearm. However, "<u>Rehaif</u> is a case of statutory interpretation; it did not establish a new rule of constitutional law." <u>United States v. Gray</u>, No. 20-3523, 2021 WL 2026929, at *2 (6th Cir. May 19, 2021). For this reason, a number of appellate courts have found that the holding is not retroactive to cases on collateral review. See e.g. <u>Mata v. United States</u>, 969 F.3d 91 (2d Cir. 2020); <u>In re Palacios</u>, 931 F.3d 1314, 1315 (11th Cir. 2019); <u>In re Sampson</u>, 954 F.3d 159, 161 (3d Cir. 2020). Although the Sixth Circuit has yet to definitively address the issue, the Government argues that the same result should obtain here.

Cases like <u>Mata</u>, <u>Palacios</u>, and <u>Sampson</u>, however, were decided in the contexts of successive petitions, not initial petitions. The standards are different between the two. In order to file a successive petition, there must be a "new rule of constitutional law," 18 U.S.C. § 2255(h)(2), and <u>Rehaif</u> clearly was not. In contrast, an initial petition can be filed based upon a "right that has been newly recognized by the Supreme Court," 28 U.S.C. § 2255(f)(3), which <u>Rehaif</u> did create. Consequently, both the Fifth and Eleventh Circuit have found that <u>Rehaif</u> claims are available on initial collateral review. <u>United States v. Kelley</u>, 40 F.4th 250, 252 (5th Cir. 2022): <u>Seabrooks v. United States</u>, 32 F.4th 1375, 1382 (11th Cir. 2022). Based upon the differences in the statutory

5

language between initial and successive petitions and in the absence of any controlling Sixth Circuit authority to the contrary, the Court agrees.

The conclusion that Rehaif may be applied retroactively in this case, however, does not mean that Franklin is entitled to relief. After all, "[i]f a person is a felon, he ordinarily knows he is a felon" and "[i]n a felon-in-possession case where the defendant was in fact a felon when he possessed firearms, the defendant faces an uphill climb." Greer v. United States, 141 S. Ct. 2090, 2097 (2021). Indeed, "under any standard of review there was overwhelming evidence that [Franklin] knew he was a felon when he possessed the firearms at issue in this case." United States v. Schmidt, 792 F. App'x 521, 522 (9th Cir. 2020); see also United States v. Jawher, 950 F.3d 576, 580 (8th Cir. 2020) (noting that "[o]rdinarily, the Government will be able to point to evidence in the record demonstrating that a defendant knew he was convicted, preventing the defendant from showing a reasonable probability of a different outcome absent the error"); United States v. Williams, 946 F.3d 968, 974 (7th Cir. 2020) (collecting cases for the proposition that where defendants had served substantial prison terms for prior felony convictions, they could not plausibly contend they did not know they held the status of felon at time they possessed firearms).

In Franklin II, the Sixth Circuit observed that "Albert Franklin, Jr. has had several encounters with the criminal justice system throughout his life." 758 F. App'x at 470. That is a huge understatement.

The PSR found that Franklin had 13 criminal history points, placing him in criminal history category V. Those points, however, hardly captured Franklin's criminal past. It began when Franklin was a juvenile. Between the ages of 13 and 15, Franklin had convictions for truancy, armed robbery, burglary and grand larceny, and he was placed in the Tennessee Department of Corrections

6

where he participated in a riot. (Case No. 3:10-cr-00055, Doc. No. 334, ¶¶ 34-37). As an adult, and beginning in 1980, Franklin had convictions for auto theft, attempted burglary, receiving stolen property, bail jumping, aggravated assault, house burglary, kidnaping, attempted escape, armed robbery, being a felon in possession, and assault. Franklin managed to commit all of these crimes before he had reached the age of 30. (Id. ¶¶ 38-50). He did so even though he had served several stints in prison during this period. (Id.).

Franklin's crimes continued. At aged 35, he was convicted of being a felon in possession and three years later unlawful weapon possession. (Id. ¶¶ 51, 52). The next year, he was convicted of possessing a controlled substance followed less than a year later by felony evading arrest. (Id. ¶¶ 53, 54). The Court could continue just as Franklin did, but these convictions alone make it inconceivable that Franklin did not know he was a felon or that the Government would not be able to prove this status to a jury beyond a reasonable doubt at trial. Franklin is therefore entitled to no relief on his Rehaif claim.

## B. Ineffective Assistance of Counsel Claims

"Defendants claiming ineffective assistance must establish two things. First, that the attorney's performance fell below 'prevailing professional norms.' And second, that the attorney's poor performance prejudiced the defendant's case." Monea v. United States, 914 F.3d 414, 419 (6th Cir. 2019) (citing Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). "Proving prejudice is not easy" because the petitioner is confronted with the "high burden" of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citing Davis v. Lafler, 658 F.3d 525, 536 (6th Cir. 2011)).

Recently, the Sixth Circuit made several observations that are particularly pertinent to

7

Franklin's ineffective assistance claims:

> The Sixth Amendment "does not guarantee perfect representation" but only "reasonably competent" representation. Harrington v. Richter, 562 U.S. 86, 110, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (cleaned up). Thus, defense lawyers need not (and in fact should not) raise every colorable argument they can find. See Davila v. Davis, ––– U.S. ––––, 137 S. Ct. 2058, 2067, 198 L.Ed.2d 603 (2017) ("Effective appellate counsel should not raise every nonfrivolous argument[.]"); Wilson v. McMacken, 786 F.2d 216, 219 n.3 (6th Cir. 1986) (trial counsel need not make "every colorable objection"). Tough judgment calls about what to challenge and what to let slide are part of lawyering. Such decisions only become deficient – that is, incompetent – when no reasonable counsel would have made the same choice at the time. Strickland [v. Washington], 466 U.S. [668] at 690, 104 S.Ct. 2052 [80 L.Ed.2d 674 (1984)]. Here, even if [defendant's] claims could be called colorable, there's simply no argument that they were so strong that every reasonable defense attorney would have run with them.

Moody v. United States, 958 F.3d 485, 492 (6th Cir. 2020). Because of these parameters, it is clear that Franklin is entitled to no relief on his claims that Hershell Koger (who represented him at trial and on appeal) provided ineffective assistance of counsel at trial, on appeal and resentencing.

**1. Ineffectiveness at Trial**

For his first claim of ineffective assistance of counsel, Franklin writes:

> Counsel rendered ineffective assistance when counsel failed to investigate the change fo custody of the weapon and interview the government witness before trial who testify at Franklin trial and stated that the weapon he recovered was a 38 smith & wesson and not the 357 smith & wesson that was in court and not the one in the inventory log sheet that Franklin was on trial for see filed by Franklin, pro se, he asserts that Koger "failed to investigate the chain of custody of the weapon and interview the government witness before trial who testify at Franklin trial and state that the weapon he recovered was a 38 smith & wesson and not the 357 smith & wesson that was in court and not the one in the inventory log sheet that Franklin was on trial for[.]

(Doc. No. 1 at 4) (scrivener's errors in original).

As background for this claim, the record reflects that, during the search of Mustang Sally's Bar, officers found a loaded Smith & Wesson .357 magnum caliber revolver hidden behind a wall.

8

That weapon was entered into the inventory log and identified as such. (Case No. 3:10-55, Doc. No. 194, Tr. Trans. at 28). Through the testimony of Lieutenant Mackall, a supervisor in the MNPD narcotics unit, the gun was entered into evidence at trial as Government's Exhibit 2 and a photograph of the gun was entered as Government's Exhibit 1-J. He, along with Buddy Rhett, a Sergeant in MNPD's interdiction unit discovered the gun. (Id. at 62).

During questioning about the gun and the inventory log at trial, the following colloquy occurred between Government counsel and Officer Michael Galluzzi, who at the time was detailed to MNPD's Specialized Investigation Department:

> Q. I'm going to hand you a copy of an inventory sheet. Is that the Smith & Wesson .357 caliber revolver you referenced? Is that located on that inventory sheet?
>
> A. Yes, sir.
>
> Q. Okay. And does it indicate where the weapon was found?
>
> A. It says behind the wall in the bar.
>
> Q. In the bar?
>
> A. Yes.

(Id. at 29).

Notwithstanding Officer Galluzzi's identification of the recovered gun as being a .357 Smith and Wesson, during his testimony, Lieutenant Mackall repeatedly referred to the weapon found in the wall as a .38 caliber. (Id. at 109-111). At one point, the following exchange occurred between Lieutenant Mackall and Government counsel:

> Q. I ask you to look at Item 15 on the inventory log. Is that gun actually a Smith & Wesson .357 caliber revolver?
>
> A. .38.

Q. How it is documented on the form?

A. .357.

Q. Is that an accurate reflection of what you recovered?

A. Yes, sir.

Q. Okay. That would have been documented?

A. Yes.

(Id. at 110-11).

Lieutenant Mackall's seemingly contradictory testimony aside, others correctly identified the gun found during the search to be a .357 magnum Smith and Wesson and not a .38. This included Officer Galluzzi (Id. at 29-30); ATF Special Agent Wayne Kilday (Id., Doc. No. 195, Tr. Trans. at 7) and Steve Scott, a firearms examiner with the Tennessee Bureau of Investigation. (Id. at 13).

Except for Lieutenant Mackall's misstatements about it being a .38 caliber weapon, the record is clear that the gun recovered from behind the wall at the bar was a .357 magnum and that this same gun was introduced as evidence. It was not ineffective for counsel to inquire into a non-issue at the risk of alienating or losing credibility with the jury.

"A trial counsel's tactical decisions are particularly difficult to attack, meaning that a defendant attacking his lawyer's performance must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Tackett v. Trierweiler, 956 F.3d 358, 374 (6th Cir. 2020) (citation omitted). "[D]eciding what questions to ask a prosecution witness on cross-examination is a matter of strategy," Peterson v. Douma, 751 F.3d 524, 531 (7th Cir. 2014), and counsel is not required to explore every inconsistency to avoid being labeled ineffective, Campbell v. United States, 364 F.3d 727, 735 (6th Cir. 2004).

Nor was Koger ineffective in failing to interview witnesses in order to see if there was some question about which gun was actually found in the wall. For one thing, the discrepancy arose only after Lieutenant Mackall testified, and there is no reason to think that he would testify that the firearm was a .38 instead of a .357 magnum, particularly given the inventory log. Regardless, under Strickland's prejudice prong, Franklin must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. That is not the case here. If anything, interviewing Mackall before trial on the issue of the gun being a .357 instead of a .38 caliber would likely have resulted in Mackall simply realizing he was mistaken about the caliber of the weapon recovered at Mustang Sally's Bar.

Franklin next argues counsel was ineffective at trial when he failed to object to the Government's statements in both opening and closing that Franklin had robbed the confidential informant. In Franklin's view, evidence and arguments about him robbing the CI (for which he was not on trial) could only serve to inflame the jury by introducing irrelevant criminal conduct.

In response, Koger has submitted an affidavit in which he states:

> Certainly the Petitioner is correct in that he was not on trial for robbery. That said, a core component of the facts of this case included the Petitioner removing the CI from the bar, whether it ve [sic] with a gun per the Government's case, or a stapler to simulate a gun per the Petitioner's trial testimony – with the alleged drugs remaining in the bar with the Petitioner. My experience with trials has been to pick and choose my arguments in front of a jury, and be careful when dealing with semantics. The Government referring to Petitioner as having robbed the CI was probably objectionable, but ultimately a matter of semantics. Upon an objection the Government could easily have replaced the term "robbed" or any of its variants with language such as, Defendant placed a gun to the CI's face/head and forced the Defendant out of the building, or Defendant, without provocation then pulled a gun on the CI and pointed it at his face, etc. Certainly, that type of language would not have been objectionable – as it would have legitimately related to the proof the Government expected to introduce at trial – and insofar as closing argument, reasonably argue evidence admitted at trial. During trials, in front of a jury, I am

11

> mindful to not emphasize likely hurtful information against my client or case – Mr. Franklin's trial was no different.

(Doc. No. 22-1 Koger Aff. at 5-6).

Deciding when to object is at the very core of trial strategy, and, "[i]n reviewing a claim of ineffective assistance of counsel, courts should decline second-guessing an attorney's trial strategy." Samatar v. Clarridge, 225 F. App'x 366, 372 (6th Cir. 2007); see also Hughes v. United States, 258 F.3d 453, 462 (6th Cir. 2001) (reiterating Strickland' standard that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "[t]his strong presumption captures the risk of a defendant's second-guessing of counsel strategy in hindsight"). Circumspection is even more warranted when counsel chooses to – or chooses not to – object during an opening statement or closing argument. United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct.").

Besides, it is far from clear that the Government's arguments were objectionable in the first place. As the Sixth Circuit recounted the facts, "[w]hen the CI entered the bar, Franklin locked the door and asked [the CI] to show him the pills. Franklin examined the pills, and quickly thereafter took out a revolver and pointed it at [the CI's] head. Franklin then forced [the CI] to leave the bar and locked the door behind him as [the CI] ran out of the bar yelling 'gun, gun.'" Franklin I, 622 F. App'x 504. Even though Franklin was not charged with robbing the CI, a court can admit and a jury can consider "uncharged background evidence as long as it is 'inextricably intertwined' with the underlying offense." United States v. Hardy, 228 F.3d 745, 748 (6th Cir. 2000). This includes

12

evidence that (1) "is a prelude to the charged offense"; (2) "is directly probative of the charged offense"; (3) "arises from the same events as the charged offense"; (4) "forms an integral part of a witness's testimony"; or (5) "completes the story of the charged offense." United States v. Edmond, 815 F.3d 1032, 1045 (6th Cir. 2016). Franklin has shown no entitlement to relief on his claim that counsel was ineffective in failing to object to the Government's opening statement and closing argument.

### 2. Ineffectiveness on Appeal

In his third claim (supplemented by counsel), Franklin contends that he received ineffective assistance of counsel because Koger abandoned him on appeal. "More specifically, [Franklin] alleges that appellate counsel failed to file a reply brief and that he was deprived the ability to communicate with his attorney during the appellate process." (Doc. No. 25 at 1). In this regard, Franklin asserts that he made repeated attempts to contact counsel. When those efforts failed, Franklin filed a complaint with the Tennessee Board of Professional Responsibility.

In a letter dated July 25, 2015, Beverly Sharpe, Director of the Board's Consumer Assistance Program ("CAP"), wrote Koger, informing him of the complaint and asking that he respond to Franklin within 10 days. (Doc. No. 1 at 39). When Koger did not respond as directed, he was sent an email from CAP asking that he respond by August 26, 2015. (Id. at 40). Apparently, Koger may not have done as directed. Instead, on August 21, 2015, he filed a Motion to Withdraw in the underlying criminal case because he had just been employed as an Assistant Public Defender for Tennessee's 22nd Judicial District. (Id. at 38). In the midst of all this, on July 31, 2015, Franklin I was decided.

In response to Franklin's claim of ineffectiveness on appeal, Koger writes:

13

> [A]t the time of Petitioner's appeal, I estimate that I would have had completed at least 150 appellate level cases. It was not my custom to contact my Appellant client and seek input on what issues I should appeal unless there was a tactical reason to do so. Those type appeals are few and far between in my experience, and Petitioner's case did not fall into that category. Additionally, appellate trial and pretrial issues are relatively limited in scope to the record on appeal. Petitioner presents a blanket assertion that a Reply Brief should have been filed, which he refers to as a "writ[t]en closing argument . . . to rebut the government position which could have been the persuading argument to prove that the government was not accurately or c[o]rrect with sufficient evidence on any of their argument." [DE 2, pg. 10] Upon review of the Defendant's and Government's respective appellate briefs, I do not see any bases to have submitted a Reply brief[.]

(Doc. No. 22-1 at 4).

The Court finds Koger's statement about his "custom" disconcerting to the extent it suggests that, once a trial is over, his clients are pretty much without communication with their lawyer. If nothing else, this raises concerns about whether counsel's "custom" is in keeping with the spirit of Tennessee Rule of Professional Conduct 1.4 relating to communications with client. However, this is not a disciplinary proceeding exploring the question of whether an ethical rule may have been breached. The questions here are whether Koger provided reasonably competent representation and whether any deficient performance resulted in prejudice to Franklin. The answer to both is "no."

The failure to file a reply brief is not *per se* ineffective assistance of counsel because "[a] reply brief . . . generally is not essential for appellate review" and "Federal Rule of Appellate Procedure 28(c) indicates that the filing of a reply brief is discretionary." United States v. Birtle, 792 F.2d 846, 848 (9th Cir. 1986) (citing F.R. App. P. 28(c)). "In fact, parties often decide not to file a reply brief as a matter of appellate strategy or because they perceive no need to do so. Its purpose is to allow the appellant an opportunity to clarify or reemphasize, in light of the appellee's brief, the issues already raised and argued in his opening brief." Id.

Moreover, Franklin fails to identify arguments he believes Koger should have made in a reply brief that could have changed the outcome of the appeal. Hence, his claim of ineffective assistance of counsel fails. Dempsey v. United States, No. CR 07-74-MN-1, 2018 WL 4567113, at *6 (D. Del. Sept. 24, 2018); Hansman v. United States, No. EP-08-CR-1908-KC-1, 2013 WL 12349558, at *6 (W.D. Tex. Apr. 30, 2013).

Contrary to Franklin's assertion in his initial *pro se* motion, a reply brief is not a final "writen [sic] closing argument." (Doc. No. 1 at 23). Rather, in a reply brief, the appellant "can only respond to arguments raised for the first time in appellee's brief." United States v. Crozier, 259 F.3d 503, 517 (6th Cir. 2001). "[T]he choice of what specific arguments to make within th[e] appeal belongs to appellate counsel," Garza v. Idaho, 139 S.Ct. 738, 746 (2019), and is "a matter of professional judgment," Jones v. Barnes. 463 U.S. 745, 751 (1983).

Franklin has not shown ineffective assistance of counsel on appeal.

### 3. Ineffective Assistance at Resentencing

After the case was remanded for resentencing, the probation office filed a revised PSR that did not designate Franklin as a career offender. Later, the presentence report was revised and included the Mississippi convictions for aggravated assault, house burglary, and kidnaping mentioned previously as the predicates for an enhanced sentence under the ACCA.

Franklin argues that new counsel (Koger had already withdrawn) was ineffective in failing to object to the presentence report being revised and claims that it gave the Government a "second bite at the apple." (Doc. No. 1 at 13). He also asserts that the probation department's revision to the PSR denied him due process.

Franklin's due process claim fails at the outset because the revised PSR now at issue was

15

provided to counsel in April 2017 and the sentencing was held on October 25, 2017. This six months is far longer than the 35 days mandated by Rule 32(e) of the Federal Rules of Criminal Procedure.

Franklin's ineffective assistance of counsel claim also fails because he cites no authority for the proposition that the probation office is unauthorized to investigate further in the absence of an objection to the initial presentence report. The Court is unaware of any such authority.

"[A]n accurate presentence report is crucial both to ensure the fairness of an individual defendant's sentence and to enhance the overall goal of uniformity in sentencing." United States v. Palta, 880 F.2d 636, 640 (2d Cir. 1989). Whether the PSR was accurate in identifying the Mississippi convictions as proper predicate offenses is discussed in the next section.

## C. The ACCA Claim

As a preliminary matter, the Government suggests that arguing about the applicability or inapplicability of the ACCA may be nothing more than an academic exercise because of the concurrent sentencing doctrine. The Court disagrees.

Recall that Franklin was resentenced to 183 months on Counts One and Two and those sentences were to run concurrently. Therefore, even if, Franklin were to prevail on his ACCA claim which served as the basis for his sentence on Count Two, Count One remains unaffected. And, because he could again be resentenced to the 183 months on Count One even if Count Two were vacated, the Government insists the concurrent sentencing doctrine applies. "This argument would be persuasive were it not for the fact that" Franklin was "ordered . . . to pay a $100 special assessment for each count of conviction." United States v. Ware, 282 F.3d 902, 906 (6th Cir. 2002) citing Ray v. United States, 481 U.S. 736, 737 (1987)). Accordingly, the Court turns to the merits.

16

The ACCA increases the penalty to fifteen years for felons who unlawfully possess a firearm when that felon "has three previous convictions by any court . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another[.]" 18 U.S.C. § 924(e)(1). The statute defines "violent felony" as follows:

> (B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that –
>
> > (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> >
> > (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . .

18 U.S.C.A. § 924 (e)(2)(B).

Franklin's predicates were deemed to be his separate Tennessee convictions for armed robbery and possession of a controlled substance, as well as his Mississippi convictions for aggravated assault, house burglary, and kidnaping. The Mississippi convictions were lumped together as one predicate act because they appeared to have occurred at the same time. That is, although they were charged by way of separate indictments, they all were committed on October 26, 1984.

In Wooden v. United States, 142 S. Ct. 1063, 1069 (2022), the Supreme Court determined that the "committed on occasions different from one another" language in the ACCA should be given its ordinary meaning; namely "an event, occurrence, happening, or episode" that may itself "encompass multiple, temporally distinct activities." In other words, an "occasion" does not end at the very moment when the elements of a particular offense has been accomplished. Id. at 1069.

17

Where, as here, the record suggest that the crimes at issue were committed on a single occasion, only one of those crimes can count as a predicate felony for purposes of the ACCA enhancement.

In light of the Sixth Circuit's decision in Franklin II, there is no longer any doubt that Franklin's Tennessee armed robbery and drug conviction are proper predicates. As for the Mississippi conviction, the Government concedes that the aggravated assault and kidnaping convictions do not count as violent felonies under the ACCA, (Doc. No. 39 at 13), and the Court agrees. That leaves Mississippi house burglary as the possible third predicate felony for the ACCA enhancement.

In Taylor v. United States, 495 U.S. 575, 600, (1990), the Supreme Court held that the ACCA requires courts to use the "categorical approach" when deciding whether an offense "is burglary, arson, or extortion, [or] involves use of explosives[.]" "To conduct this analysis, . . . we evaluate only whether the state statute is equivalent to or narrower than generic burglary, and we ignore the actual facts of the underlying case." United States v. Paulk, 46 F.4th 399, 402 (6th Cir. 2022). "Any burglary offense with elements that match or are narrower than the elements of generic burglary can be a predicate under the enumerated-crimes clause." Cartwright v. United States, 12 F.4th 572, 576 (6th Cir. 2021). However, "if the burglary offense can include conduct that is not generic burglary, convictions under that statute cannot be ACCA predicates." Id.

Generic burglary for purposes of a "violent felony" under the ACCA has the "basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Taylor 495 U.S. at 599. The question under the categorical approach becomes whether the Mississippi burglary statute in effect at the time of Petitioner's state court conviction had equivalent (or narrower) elements, or not. To make that determination, the Court must "defer to the state

18

supreme court's determination of the state's law." Cartwright, 12 F.3d at 576.

At the time of Franklin's burglary conviction, the Mississippi code read:

> Every person who shall be convicted of breaking and entering any dwelling house in the day or night with intent to commit a crime shall be guilty of burglary and be imprisoned in the penitentiary for not more than ten years.

Miss. Code Ann. § 97-17-19. "Dwelling house," in turn was identified under the code as follows:

> Every building joined to, immediately connected with, or being part of the dwelling house, shall be deemed the dwelling house.

Id. § 97-17-31.

Unsurprisingly, the Mississippi Supreme Court has found that "[t]he crime of burglary consists of two essential elements: (1) burglarious breaking and entering of a dwelling or building, and (2) the intent to commit a crime therein." Mason v. State, 344 So. 2d 144, 145–46 (Miss. 1977). This fits easily into Taylor's definition of "generic burglary"; to wit, the "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Taylor 495 U.S. at 599. Both the Fifth Circuit and the Southern District of Mississippi have held as much. See, United States v. Clay, 921 F.3d 550, 557 (5th Cir. 2019) (finding "unavailing" defendant's contention "that § 97-17-19 does not comport with 'generic burglary' under the ACCA"); United States v. Chaney, No. 1:07CR12-LG-JMR, 2010 WL 11646875, at *5 (S.D. Miss. Aug. 17, 2010) (finding that the different versions of Mississippi's burglary statute, including § 97-7-17 "meets Taylor's definition of burglary").

Notwithstanding such cases, Franklin insists that Mississippi's house burglary statute cuts a broader swath of conduct than generic burglary because "dwelling house" could include a number of locations, such as a "tent." (Doc. No. 38 at 5-7). The statutory definition of "dwelling house"

19

suggests otherwise. Indeed, the Mississippi Supreme Court has long recognized that its legislature "did not see fit to extend the term 'dwelling house' beyond the normal understanding of the meaning of that term." Robinson v. State, 364 So. 2d 1131, 1133 (Miss. 1978). Moreover, the Sixth Circuit in United States v. Richardson found (albeit in the context of a similar Georgia statute) that the requirement that the burglary was committed in a "dwelling house" conformed to generic burglary and met Taylor's definition, particularly since the elements were: "(1) an unlawful entry (2) into a dwelling house or building (3) with intent to commit a crime therein." 890 F.3d 616, 629 (6th Cir. 2018). 890 F. 3d 616, 629 (6th Cir. 2018). The same can be said about Franklin's Mississippi house burglary conviction and so he is entitled to no relief on his ACCA claim.

### III.  CONCLUSION

On the basis of the foregoing, Franklin's Motion to Vacate, Set Aside or Correct Sentence and his supplements thereto will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE